# EXHIBIT

# B

*Lucy Graetz Kish, et al. v. SunTrust Bank, et al.*

U.S.D.C., N.D. Georgia, Atlanta Division

CA No. 1:06-cv-0968-BBM

# EXHIBIT 2

**to the Appendix of Evidentiary Materials in Support**
**of Plaintiffs' Application for Fees and Expenses**
**and Approval of Award to the Class Representative**

# Declaration of Sam C. Pointer, Jr.

**submitted in *In re Allstate Insurance Co. Underwriting and Rating Practices***
***Litigation*, MDL No. 1457 (M.D. Tennessee)**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN RE ALLSTATE INSURANCE COMPANY    )       MDL Docket No.
UNDERWRITING AND RATING PRACTICES   )       3:02-MD-1457 - ALL CASES
LITIGATION                          )       Judge: Trauger

## DECLARATION OF SAM C. POINTER, JR.

(1)     My name is Sam C. Pointer, Jr.  This declaration is offered in support of class

counsel's application for an award of fees and expenses in the amount of $8,000,000.  In my

opinion, the requested award is fair and reasonable, and is justified under either the percentage of

the fund approach or a lodestar analysis.

(2)     I am a lawyer licensed to practice law in the State of Alabama and currently am a

partner at Lightfoot Franklin & White, LLC., a litigation specialty firm in Birmingham

consisting of approximately 50 lawyers.   The firm's practice focuses on representing

corporations and other defendants in complex civil cases, including class actions and

multidistrict litigation, although we occasionally represent plaintiffs and plaintiff classes in such

cases.  In addition to working on complex litigation at the trial and appellate levels on behalf of

the firm's clients, I regularly serve as a mediator and arbitrator and am on the National Panel of

the C.P.R. Institute for Dispute Resolution.  I have also been specially engaged by other law

firms as a consultant on class and multidistrict litigation, including issues relating to attorneys'

fees.

(3)     During the period from 1970 through 2000, I served as a United States District

Judge for the Northern District of Alabama and as the district's chief judge from 1982 through

1

1999. I also served as a judge on the Temporary Emergency Court of Appeals from 1980 to 1987. During my tenure as a federal judge, I presided over the trial or settlement of a wide variety of major class, multidistrict, multiparty, and other complex cases, including the Cast Iron Pipe Antitrust Litigation,[1] the National Steel Industry Employment Litigation, and the Silicone Gel Breast Implant Litigation. For seven years, I was a member of the Judicial Panel on Multidistrict Litigation, and, as Chairman of the Board of Editors, I was the principal author of the Manual for Complex Litigation, Second. I also served as Chairman of the Advisory Committee on Civil Rules (1991-1993) and as a member of the Judicial Conference of the United States (1987-1990), of the Standing Committee on the Rules of Practice and Procedure (1988-1990), of the Judicial Ethics Committee (1980-1988), and of the Judicial Council for the Eleventh Circuit (1987-1990).

(4)    I am a life member of the American Law Institute and a past director of the American Judicature Society. I also am a past member of the Councils of both the Litigation Section and the Judicial Administration Division of the American Bar Association. I have been honored with the Frances E. Rawle Award from ALI-ABA, with the Samuel E. Gates Award from the American College of Trial Lawyers, and with an Honorary Fellowship in the American College of Labor and Employment Lawyers.

(5)    I am personally familiar with the legal ability and professional reputation of the law firm of Doffermyre Shields Canfield Knowles & Devine in Atlanta, particularly through my knowledge of its lawyers Ralph Knowles and Leslie Bryan and years of first hand experience with the way in which they have handled difficult and challenging litigation. The law firm has a

---

[1] The Cast Iron Pipe Antitrust Litigation was one of the early MDL cases, and involved the first trial to a jury in the United States of a claim for damages by a nationwide class. I also presided several years later in the Plywood Antitrust Litigation, which involved the third such trial in the United States to a jury of damage claims for a

reputation for professional excellence, especially in the area of class actions and complex civil litigation, and for ethical and effective representation of its clients.

(6)     I have extensive personal experience in evaluating requests for attorneys' fees in class action cases, am generally knowledgeable about the applicable law, and am familiar with awards in similar cases, including many unreported decisions. During my almost 30 years as a federal judge, I considered applications for attorneys' fees in several hundred cases (scores of which involved fees in class actions), and rendered decisions regarding their fairness and reasonableness. Because of my experience and my work as primary author of the Manual for Complex Litigation, Second, I frequently gave presentations to other federal judges at judicial workshops, and on occasion was informally consulted by other federal judges on such issues. As a practicing lawyer for the past 5 years, I have been involved – both on behalf of defendants and plaintiffs – in a number of class actions where fees were at issue. As a mediator, I have worked with parties in efforts to resolve disputes and reach agreements regarding the reasonableness of fees sought by plaintiffs' counsel in MDL and class actions. On a few occasions I have served as an arbitrator or Special Trustee in resolving issues regarding attorneys' fees in major litigation.

(7)     I have been asked by class counsel to review certain materials relating to this case and to give my opinion regarding whether the amounts sought by class counsel in their application for attorneys' fees and expenses are fair and reasonable and comport with the applicable legal standards.     In order to come to my opinion, I have been furnished with numerous documents, including the Court's docket sheet; the settlement agreement; the class notice and educational brochure sent to class members; the objections to the settlement; drafts of

nationwide class.

3

the fee application and brief responding to the objections; the declarations of Evan Hendricks,

Professor Reidenberg, and Professor Cohen; the joint declaration of Kenneth S. Canfield and

Terry Smiljanich; the various declarations and affidavits of the class counsel; and class counsel's

billing records. In addition, I have interviewed Mr. Canfield and Mr. Smiljanich.

(8)     Based upon my review of the materials and other information that I have received

regarding the case, it is my opinion that the amount of attorneys fees sought by class counsel is

fair and reasonable, consistent with amounts that have been awarded in analogous circumstances,

and justified under either the percentage or lodestar approach. It is also my opinion that the

value of the services performed by class counsel in this case equals or exceeds the amount that

they are seeking.

(9)     The starting point in my analysis is the fact that class counsel and Allstate reached

an agreement providing that, subject to the Court's approval, Allstate will pay a total of

$8,000,000 for fees and expenses. Under the agreement, class counsel also agreed to waive any

right or ability to seek a larger fee and Allstate agreed that it would not oppose the application to

be filed by class counsel. Because class counsel's fees will be paid directly by Allstate, the

benefits to be received by class members will not be reduced or otherwise affected by the

amount of fees awarded to class counsel. In my view, when the parties have reached an arms

length agreement on the payment of fees and expenses and the defendant will pay them directly

without contribution by (or impact upon) class members, a court ordinarily should defer to and

approve the parties' agreement unless there is some discrete reason for the court to interfere,

such as collusion between the parties or the absence of a fair and adequate settlement for the

4

class.

(10)   None of the objectors have presented any evidence of collusion between the parties in this case, and I am not aware of any such evidence. To the contrary, there is strong evidence suggesting not only the absence of collusion, but also that the parties conducted themselves in an exemplary manner and that their negotiations resulted in a fair fee. First, the parties did not discuss the issue of fees until after a settlement of the merits of the litigation had been reached and the court was informed of the settlement. Although the law may not require that talk of fees and the merits be separated in this manner, nevertheless by doing so the parties here minimized any potential conflict that might otherwise arise between the financial interests of class counsel and their clients. Second, the extent and difficulty of the negotiations establishes that the amount agreed upon was reached through an arms length process. Third, during the fee negotiations, class counsel took the position that if the parties could not reach an agreement the amount of the fee should be determined by the Court, allowing each side to present their arguments regarding the appropriate amount. By taking this position, class counsel completely separated their interests from those of the class and demonstrated that they believed in the fairness of their demands. The fact that Allstate did not accept class counsel's offer indicates that the company believed there was an unacceptably high risk that the Court would approve a fee larger than what it had offered to pay. The resulting resolution of these conflicting positions reflects the parties' assessment of a fair fee and undercuts any fear that class counsel are seeking an undeserved windfall. This assessment – presumably made by the parties in light of their familiarity with the work done by class counsel, knowledge of the value of the

5

settlement, and awareness of the applicable law – is entitled to a great deal of judicial deference. I note also that a reduction in the fee request would benefit not the class, but Allstate.

(11)   The next question is whether the settlement is fair and adequate in terms of the benefits to be received by the class.  In the absence of collusion, if the settlement is fair and adequate, that should foreclose an attack on the class counsel's fee application.   Here, it appears the settlement is fair and adequate.  Class counsel have presented persuasive affidavits from a privacy expert and a law professor who specializes in matters relating to the Fair Credit Reporting Act, both of whom testify that the settlement logically and appropriately carries out the purposes of the statute, to the extent practicable puts class members in the position that they would have been in had Allstate complied with the Act as construed by plaintiffs, and affords relief to the class that would be unavailable if the case were successfully litigated.   Class counsel have also presented testimony from an economist showing that the value of the settlement benefits exceeds $167.5 million.  In contrast, the objectors have presented no factual or expert evidence.  While they assert a variety of objections, their principal complaint seems to be that the free credit report available to class members allegedly has little, if any, value.   This complaint seems to be effectively dealt with by the experts.  In any event, the fact that more than 900,000 class members, to date, have gone to the trouble of ordering a free credit report under the settlement, while only 100 or so class members have objected, indicates that the free credit report has value.

(12)   Another factor in my analysis of the fairness of the settlement is that it provided a right for class members to opt out.  This right was meaningful.  Under the Fair Credit Reporting

Act, a class member who was subjected to a "willful" violation has the right to bring a lawsuit, recover statutory damages between $100 and $1000, and recover attorneys fees. These provisions provide an adequate incentive for a class member, dissatisfied with the efforts of Class Counsel, to opt out and to pursue his own case. Accordingly, to the extent a class member felt that the value of the free credit report and proxy damage remedy is illusory or that the settlement is otherwise inadequate, the class member could have opted out. The fact that only 360 or so class members have opted out in a case of this magnitude is evidence that the benefits of the settlement are fair from the standpoint of the class.

(13) The requested award of fees and expenses is warranted under the percentage method used in common benefit class action cases. Using the values established by Professor Cohen, the requested award is approximately 4.5 percent of the minimum monetary benefits of the settlement. Using the more limited analysis of the two privacy experts, the requested award is less than 6.5 percent of the settlement's monetary value. Under either approach, an award of $8,000,000 for fees and expenses certainly is appropriate and not excessive. In similar cases, courts typically use substantially higher percentages in evaluating fee requests. Further, substantially higher percentages would be justified by specific factors that courts in the Sixth Circuit and elsewhere use in applying the percentage approach – the value of the benefits received by the class, society's stake in rewarding class action attorneys and encouraging private enforcement of regulatory statutes, the contingent nature of cases such as this one, the complexity of the litigation, and the professional skill and standing of the counsel for the parties.

(14) Several objectors argue that in valuing the settlement for purposes of applying the

7

percentage approach the Court should ignore the value to class members who do not avail themselves of the opportunity to receive a free credit report, focusing instead on the value of the actual benefits resulting from the claims process. Even if this approach were used, the requested fee would be justified. According to Professor Cohen, the minimum value of the benefits that flow to the more than 900,000 class members submitting a claim under the settlement is roughly $57 million – $8.5 million for the free credit report, $2.5 million in educational benefits, $1.2 million from the damages remedy, $29.1 million in interest rate savings, and $15.7 million from early detection of identity theft. Again, these figures support the requested award using the percentage method.

(15)    The requested award also is warranted under the lodestar approach. Based upon their affidavits, class counsel collectively have spent approximately 11,000 hours on the national class actions that are consolidated before the Court. I have not done a detailed review of the billing records of the various lawyers involved to evaluate for each entry whether the work was justified or needlessly duplicated the work of other lawyers. Such a review would be time consuming, is inherently difficult, involves many subjective determinations, and, in any event, is unnecessary here. I can state from experience that it would be reasonable and appropriate for class counsel to have spent the quantity of time documented in their records in prosecuting the cases involved. Further, while it is inevitable in a multidistrict proceeding that there will be some, even substantial, duplication of work by the plaintiff lawyers involved, any duplication in this case appears to have been kept to a minimum. I have reviewed a comparison of the time spent by each of the plaintiffs' law firms, which demonstrates that during the course of the

8

proceedings before this Court co-lead counsel have done the bulk of the work and that the time expended by most members of the steering committee was relatively modest.

(16)    Not surprisingly given the history of this litigation, the Court's docket sheet does not reflect the amount of work done by class counsel. Based upon my review of the materials furnished to me, it appears several factors are responsible. First, a substantial amount of work was done on cases before they were transferred to this Court. Second, the Court's docket would not reflect work that was done in connection with the petition that was filed before the Judicial Panel on Multidistrict Litigation. Third, in a multidistrict proceeding such as this one involving multiple law firms, class counsel must spend a substantial amount of time coordinating their activities and working on logistical matters outside of the purview of the court. Fourth, class counsel conducted significant discovery which did not trigger filings with the clerk. Fifth, that there may have been relatively few motions and pleadings filed in the case is explained by the fact that the parties requested the Court defer consideration of dispositive motions to allow settlement talks to talk place. Class counsel also state that they were unusually successful in working with defense counsel to reduce unnecessary discovery disputes. Sixth, a great deal of the time spent by class counsel involved settlement discussions, work necessary to understand Allstate's business practices, consulting with experts, evaluating the merits of the settlement, and drafting settlement documents.

(17)    According to class counsel, the value of the time that they expended is approximately $4,000,000, with this lodestar figure calculated by using rates ranging from a low of $75 per hour for certain paralegals to a high of $500 per hour for one of the co-lead counsel.

9

While I am not personally familiar with most of the lawyers and law firms representing the
plaintiffs in this case, the range of hourly rates is not unusual or excessive in a case of this type.
Further, class counsel's total lodestar amount is not unexpected and is consistent with my
experience in multidistrict proceedings such as this one. I understand that at least in some cases
the Middle District of Tennessee has used local billing rates in awarding fees to out-of-state
counsel. In my view, a more appropriate approach in an MDL case is to measure the
reasonableness of class counsel's billing rates against rates charged by other lawyers in their
home areas rather than Tennessee rates. With a few exceptions, class counsel did not file their
cases directly in this district and the cases have only been transferred for pre-trial purposes.
Further, to the extent that class counsel practice in areas where billing rates and expenses are
substantially in excess of those charged in Tennessee, using local rates would unfairly penalize
the lawyers involved and, by resulting in compensation below what the lawyers would have
anticipated when the cases were filed, undercut the private attorney general function of fee
awards in cases of this nature.[2]

(18)    Where a lodestar approach is used, courts frequently apply a multiplier to class
counsel's lodestar – sometimes to reflect the contingent nature of the representation, but more
often because of the level of success achieved in comparison with the hours spent by class
counsel in conducting and ultimately resolving the litigation – a reward for efficiency. In similar
cases, it is not unusual for a multiplier of 2 or more to be applied. Certainly, a multiplier of 2 –
if not more – would be appropriate under the facts of this case. I note that there were major

---

[2] It would also inject a new complicating factor into the considerations on which the Judicial Panel on Multidistrict
Litigation bases its decision of a transferee district.

difficulties that loomed as potential barriers to a recovery on behalf of the class, both with respect to the merits of the claims and defenses and with respect to the certification of a class.

(19)   In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

This the 11th day of July, 2005.

Sam C. Pointer, Jr.

11